Caroline WINTER and Marie Kantowicz, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Arthur F. QUERN, as the Director of the Illinois Department of Public Aid; and the Illinois Department of Public Aid, a governmental agency, Defendants.

No. 76 C 1458.

United States District Court,
N. D. Illinois, E. D.

April 9, 1980.

Robert S. Berger, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

George L. Grumley, Jean M. Golden, Sp. Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs Caroline Winter and Marie Kantowicz have brought this class action seeking declaratory and injunctive relief against the Illinois Department of Public Aid ("IDPA") and its director, Arthur Quern, with respect to the eligibility levels and excludable income levels employed in the Medical Assistance Program ("Medicaid") for certain aged, blind, and disabled

individuals and couples.[1] Medicaid is a public assistance program based on federal-state cooperation. Under the program, the state makes payments to qualified providers of health services on behalf of eligible or medically needy persons. In turn, the federal government reimburses the state for approximately 50% of these payments if the state plan is in compliance with the governing statutory and regulatory requirements.

There are two classes of persons who are beneficiaries of Medicaid payments. The first class includes those persons who are "categorically needy." They receive cash welfare payments from the state and automatically are eligible for Medicaid benefits. The second class consists of persons who are "medically needy." These recipients do not have a sufficiently low income to qualify for cash welfare payments, but nonetheless have medical bills which exceed their income and ability to pay. Under this branch of the Medicaid program, known as Medical Assistance-No Grant (MA–NG), the state will pay the medical expenses of eligible persons who "spend down" so that their income is the same as that of persons who receive cash welfare grants.[2] Federal law, however, requires that the level to which MA—NG applicants are required to spend down be no lower than "the most liberal money payment standard used by the state" in determining cash grant assistance to the categorically needy. 42 U.S.C. § 1396a (a)(17); 42 C.F.R. 448.21(a).[3] In this way, federal law seeks to ensure that the medically needy, who have sources of income independent from welfare payments, are at least as well off as those persons who receive cash welfare grants.

1. Despite plaintiff's allegations to the contrary, subject matter jurisdiction over the claims set forth in the complaint cannot be acquired pursuant to 28 U.S.C. § 1343, *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979). This Court, however, does possess jurisdiction under 28 U.S.C. § 1331. Declaratory relief is authorized under 28 U.S.C. §§ 2201 and 2202 as well as Fed.R.Civ.P. 57. By court order dated July 26, 1976, a class was certified consisting of all aged, blind, and disabled individuals and couples who have applied for Medical Assistance benefits in Illinois since June 1, 1974, and whose non-exempt income exceeds $150 for individuals and $200 for couples per month.

2. By "spending down", MA–NG applicants with incomes in excess of the cash grant eligibility level contribute the excess amount to the state in return for the state's payment of their medical costs. Plaintiffs have supplied the following example of how the system operates:

Suppose Illinois paid aged and disabled welfare recipients $180/month. An aged or disabled person with higher income from a source other than welfare (normally from Social Security) could obtain Medicaid eligibility as a "medically needy" person in the MA-NG program if his medical expenses over a six-month period exceeded the difference between his countable income and the $180 eligibility level. Thus, if his countable Social Security income were $200/month:

| (a) Countable Income (Social Security | $200/month × 6 months = $1200 |
| (b) [minus] Eligibility Level | $180/month × 6 months = $1080 |
| (c) "Excess" Income "available" for medical expenses | $20/month × 6 months = $ 120 |

Since countable income over 6 months exceeds that hypothetical eligibility level (theoretically a definition of need for non-medical subsistence items) over 6 months by $120, that is the amount of "excess income" that the individual must "spend down"; he is allowed to retain $180/month for non-medical needs. If the applicant's medical bills over the 6-month period are less than $120, he or she is not eligible. If the applicant's medical bills over the 6-month period exceed $120, then he or she is eligible, *but* must contribute the $120 "excess" income theoretically available for medical bills to the payment of such bills. Thus, if the person had $400 medical bills, his share would be $120, which is owed directly to the state, and the Illinois Department of Public Aid would pay the remaining $280 of medical bills.

Memorandum in Support of Plaintiffs' Motion for Summary Judgment, at 3-4.

3. 42 U.S.C. 1396a(a)(17) provides in relevant part:

(a) A State plan for medical assistance must—
(17) include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan . . .

Plaintiffs contend, however, that the Illinois program since its inception in 1966 has operated in contravention of this federal policy. Initially, the state set MA–NG eligibility levels at $150 for individuals and $200 for couples. In an earlier opinion in this case, Judge McGarr, who previously presided in this action, held that these eligibility levels were impermissibly low.[4] As a result, the defendants thereafter raised the levels to $168 and $205, respectively. Since then, defendants have raised the eligibility levels one more time, to $171 and $216, respectively. Plaintiffs continue to attack these eligibility levels as well as certain other elements of the Illinois MA–NG program. Specifically, the plaintiffs allege in Counts II and III that the present eligibility levels are impermissibly low under both federal and constitutional law and in Count IV that the excludable income provisions of MA–NG violate both federal constitutional and statutory law.

▮ Presently pending before the Court is plaintiffs' motion for summary judgment on the elements of the complaint left unresolved by Judge McGarr's opinion. The Seventh Circuit has observed that "(w)ith the ever increasing burden upon the judiciary, persuasive reasons exist for the utilization of summary judgment procedure whenever appropriate." *Kirk v. Home Indemnity Co.*, 431 F.2d 554, 560 (7th Cir. 1970). Nonetheless, it remains the burden of the moving party to clearly establish the nonexistence of any genuine issue of material fact. *Cedillo v. International Association of Bridge & Structural Iron Workers, Local Union No. 1*, 603 F.2d 7, 10 (7th Cir. 1979). Any doubts must be resolved against the moving party. *Moutoux v. Gulling Auto Electric, Inc.*, 295 F.2d 573, 576 (7th Cir. 1961).

42 C.F.R. § 448.21 (1977) was enacted in order to provide standards for states participating in Medicaid. Of particular interest in this case is § 448.21(a)(3)(i)(B) which provides that if the medically needy are to be included in the plan, the state must provide levels of income and resources for establishing financial eligibility which are
> as a minimum, at the levels of the most liberal money payment standard used by the

## VALIDITY OF ILLINOIS MA–NG ELIGIBILITY STANDARDS

In Illinois, the eligibility of an aged, blind, or disabled person for cash welfare grants is determined on an individualized basis. Both basic needs—shelter, utilities, food, and clothing—and special needs are incorporated into this eligibility standard. In determining MA–NG eligibility for these persons, however, IDPA has translated this individualized standard into different flat rates for individuals and couples. The $168 and $205 eligibility standards imposed in the aftermath of Judge McGarr's opinion were derived by taking the 90th percentile of total budgeted needs of all cash welfare recipients. The levels presently in effect— $171 and $216—are derived by computing hypothetical budgets composed of allowances for the basic needs as well as one special need: laundry. Both methods share one important element; they fail to incorporate into the computation all the special needs that are factored into the determination of a categorically needy applicant's eligibility level.

▮ According to 42 C.F.R. § 448.21, MA–NG eligibility levels are to be "as a minimum, at the levels of the most liberal money payment standard used by a state" in determining eligibility for its cash welfare programs. Plaintiffs argue that the most liberal money payment standard consists of the sum of all basic and special needs. Thus, they contend that the present eligibility standards for MA–NG applicants violate federal law in two ways. First, the present level fails to account for all special needs that the state considers when it determines eligibility levels for cash grant

> State, at any time on or after January 1, 1966, as a measure of financial eligibility in any categorical money payment program in the State. . . .

**4.** *Winter v. Trainor*, Civil Case no. 76 C 1458 (N.D.Ill., January 6, 1977) (unpublished opinion).

payments.[5] Second, the prior levels of $168 and $205 suffer the vice of ensuring that 10% of MA–NG recipients will have less disposable income than do categorically needy persons. In each case, plaintiffs contend that the levels violate federal law by placing MA–NG recipients at a disadvantage vis-a-vis cash grant recipients.[6]

The Court agrees. The federal law accords states wide discretion in administering the Medicaid program. The state may adopt a flat amount eligibility level which includes all special needs; it may conduct case-by-case inquiries into the need of each applicant for MA–NG; or it may utilize a combination of these procedures. Whatever system is used, however, the State must adopt a standard which puts the medically needy on at least an equal footing with cash grant recipients.[7] It was for this reason that the court in *Aitchison v. Berger*, 404 F.Supp. 1137, 1149 (S.D.N.Y.1975), *aff'd*, 538 F.2d 307 (2d Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), found an averaging formula utilizing the 50th percentile violative of 42 C.F.R. § 448.-3:

> The programs in question are for real people with real needs, not statistical averages. Construing the legal documents liberally in favor of the needy, it makes eminent sense to read the standards in terms of every individual or family, not

---

5. Consider an example of how the present system would affect a categorically needy applicant as opposed to a similarly situated medically needy applicant:

> An aged individual, eligible for AABD [cash grants] in January 1, 1972, who needed a housekeeper, could have had this special need included in determining his standard of need for AABD, and, because of this expensive special need, might have received AABD benefits of $250 a month. Yet, another aged individual, with the same needs including the need for a housekeeper, who has $300/month Social Security income, making him ineligible for cash assistance, but medical expenses of $150 making him eligible for MA–NG, is required to "spend down" his income to the $171 level, rather than to the $250 level. . .

Memorandum in Support of Plaintiffs' Motion for Summary Judgment, at 14.

6. At the outset, defendants argue that Judge McGarr's opinion of January 6, 1977, not only found that $150/$200 standard was illegally low, but also that the $168/$205 level originally approved by the federal government in November, 1971, and reinstituted after that opinion was in conformance with federal law. Thus, they contend that the Court should recognize this latter finding as the law of the case. Alternatively, defendants argue that even if the legality of the $168/$205 standards has not been established as law of the case, Judge McGarr's approval of these standards is entitled to great deference.

Defendants' arguments, however, misconceive the issues that were before Judge McGarr in the earlier proceeding. The cross-motions for summary judgment filed by the parties therein raised only the question of whether the $150/$200 standards used by defendants violated federal law. Any suggestion by Judge McCarr as to the propriety of the $168/$205 levels was dictum and not binding upon this Court.

Defendants also submit that the federal government's approval of the $168/$205 standards, as indicated by a letter from the Regional Commissioner of the Social and Rehabilitation Service of the Department of Health, Education and Welfare, Region V, raises a material issue of fact as to the propriety of those standards, thereby rendering summary judgment inappropriate. This latter, however, reflects the legal judgment of the Commissioner rather than a factual issue. Moreover, it is clear that this legal judgment, while of some evidential value, is not controlling upon the Court. *Fabula v. Buck*, 598 F.2d 869, 873 n. 11 (4th Cir. 1979); *Aitchison v. Berger*, 404 F.Supp. 1137, 1148 (S.D.N.Y.1975), *aff'd*, 538 F.2d 307 (2d Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

7. Congress intended that 42 U.S.C. 1396a(a)(17) and the related regulation 45 C.F.R. § 248.3 (now retitled 42 C.F.R. 448.3) would prevent states from devising a program whereby the medically needy would be allowed to live below the public assistance level:

> In no event . . . may a State require the use of income or resources which would bring the individual's income below the amount established as the test of eligibility under the State plan. Such action would reduce the individual below the level determined by the State as necessary for his maintenance.

S.Rep.No.404, 1 U.S.Code Cong. & Admin. News, pp. 1943, 2019 (1965). *See also Aitchison v. Berger*, 404 F.Supp. 1137, 1149 n. 41 (S.D.N.Y.1975), *aff'd*, 538 F.2d 307 (2d Cir. 1976), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

to hold that it is sufficient in some average is accomplished.

To discriminate against the self-supporting by requiring them to live on income below the level declared by New York to be necessary for minimal maintenance would do violence to the aims of Medicaid legislation and common sense. Our concern here is with people who have not sought public assistance for routine support, but only to meet the catastrophe of serious illness.

\* \* \* \* \* \*

Nevertheless, it remains deep and familiar in our esteem for individual initiative that we would not deem it acceptable without some particular justification to treat those outside categorical assistance groups less generously than those within. The questioned regulation, fairly read, reflects this philosophy.

█ IDPA's use of the 90th percentile of cash welfare recipients as the eligibility level for medically needy applicants also results in inequities not different in substance from those arising from the averaging formula employed in *Aitchison*.[8] The Court does not hold that IDPA cannot set a flat medical eligibility standard for MA–NG applicants. That standard, however, cannot be permitted to place medically needy persons in a less advantageous position than categorically needy persons. Therefore, if IDPA chooses to utilize an averaging formula, it must provide some process whereby medically needy applicants will have the opportunity to bring to IDPA's attention

any special needs which would allow them to retain more of their income. In this way, all medically needy recipients would be treated at a minimum at least as well as similarly situated categorically needy recipients with special needs.

Thus, to ensure that federal requirements are satisfied and at the same time to avoid costly individual determinations of the eligibility of medically needy applicants, the Court holds that the present eligibility levels may remain in force.[9] But if IDPA retains this standard, it must review the status of any MA–NG applicant who makes a prima facie showing that such special needs exist. The special needs to be considered are the same as those incorporated in the categorical assistance computations. Once a special need is shown, IDPA must use the cash assistance standards in determining the individual's eligibility level. Accordingly, IDPA is ordered to prepare a plan on the basis of these guidelines and submit it to plaintiffs for review and the opportunity to make objections. The Court will be available to resolve any problems in implementing the necessary changes.

## VALIDITY OF ILLINOIS INCOME DISREGARDS

█ In computing the cash grants for categorically needy persons, IDPA uses an "income disregards" standard by which the agency excludes from consideration $25 of an applicant's monthly income. A medically needy applicant, on the other hand, receives a corresponding credit of only $7.50.[10]

---

**8.** Defendant makes much of the fact that the Illinois program freezes in inadequate levels only 10% of MA–NG recipients, whereas the scheme in *Aitchison* had this impact on 50% of benefits recipients. The Court finds this distinction unconvincing. The unequivocal language of the federal law requires that *all* MA–NG recipients be placed in a position of at least as favorable as those persons on cash grant assistance. Thus, the applicable federal policy has been violated whether 1 or 1,000 MA–NG recipients are treated less favorably than the categorically needy.

**9.** Of course, the State would be free to adopt a different formula for determining eligibility levels, upon considerations such as administrative

convenience and minimization of overpayments. It is up to the state to determine the formula which best suits the particular needs. All that this opinion requires is that the formula devised ensure that no MA–NG recipient is placed in a *less favorable position than the categorical needy.*

**10.** This difference in income disregards will have a significant impact on low income individuals. For example, if two applicants both have a $180 monthly income, the one eligible for a cash welfare supplement is considered to have a monthly income of $155 whereas the applicant for the medically needy program will be credited with an income of $172.50. To persons whose income barely provides for the

Plaintiffs argue that this system is contrary to applicable federal regulations and law.[11] The Court agrees that a state must allow the medically needy at least the same amount of income disregards as it does the categorical needy.[12] Thus, the Court finds that pursuant to both 42 U.S.C. § 1396a(f) and 42 C.F.R. § 448.3(c)(3)(ii)(B), IDPA must apply the same income disregards level to both categories of recipients.[13] Accordingly, plaintiffs' motion for summary judgment is granted with respect to Count IV.[14]

## CONCLUSION

Plaintiffs' motion for summary judgment as to Counts II and IV is granted. Defendants are ordered within 30 days to prepare and file with this Court a plan which will take into account the special requirements of those medically needy applicants who are able to demonstrate that they are entitled to such consideration. Within 15 days after such filing plaintiffs are to review the plan and meet with defendants to resolve any disagreement with the plan. Within 15 days after this meeting, or within 30 days after the plan is filed, if no such meeting is required, plaintiffs shall file with the Court a statement of approval of the plan or objections thereto. This cause is placed on the Court's status call for August 1, 1980, at 10:00 a. m. It is so ordered.

---

necessities of life, the sum of $17.50 per month is significant.

11. 42 U.S.C. § 1396a(f) provides in pertinent part that no state

shall be required to provide medical assistance to any aged, blind, or disabled individual . . . for any month unless such State would be (or would have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved under this subchapter and in effect on January 1, 1972, been in effect in such month, except that for this purpose any such individual shall be deemed eligible for medical assistance under such State plan if (in addition to meeting such other requirements as are or may be imposed under the State plan) the income of any such individual . . . is not in excess of the standard for medical assistance established under the State plan as in effect on January 1, 1972.

42 C.F.R. 448.3(c)(3)(ii) further provides that

(ii) In the case of the aged, blind, or disabled, the highest of:
(A) The disregard applied in title XVI, or
(B) The disregards applied in the State supplementary payment program which are available to all individuals who are or would be (except for their income level) eligible for a title XVI benefit, except that in a State which has limited coverage of the categorically needy by applying eligibility requirements which are the same as or at a level between those in its January 1, 1972, plan and those under title XVI, disregards which similarly fall within January 1, 1972, and title XVI levels, provided that they are at least the same as those allowed to the aged, blind, and disabled categorically needy.

12. In a related case involving a state program which applied an income limitation rendering ineligible for benefits medically needy but not categorically needy applicant with equity of over $7,500 in a house and land, the court held that the inequity violated federal law by subjecting medically needy applicants to a resource limitation less liberal than those in other state-financed money payment programs. *Schaak v. Schmidt*, 344 F.Supp. 99 (E.D.Wis. 1971). In the instant situation, Illinois has decided to exempt $25 from a cash recipient's income but at the same time has applied a far less liberal standard with respect to a MA–NG applicant's income. This distinction clearly frustrates the federal purpose of ensuring that the medically needy are not disadvantaged vis-a-vis the categorically needy.

13. The Court is aware that IDPA has indicated that this holding may result in a lowering to $7.50 rather than a raising to $25.00 the income disregard level to be applied to both groups. That possibility, however, does not affect the outcome of the instant case. Inasmuch as the issue is not properly before the Court, the Court expresses no view as to whether such a course would be permissible.

14. Since the Court has decided the issues on statutory grounds, it is not necessary to address the constitutional issues raised in Count III.